UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x

UNITED STATES OF AMERICA

        v.

MARC M. LAWRENCE,

        Defendant.

--------------------------------------------------------- x

Index No. 19-Cr-437 (AKH)


**SENTENCING MEMORANDUM ON BEHALF OF**
**MARC M. LAWRENCE**


**HARRIS ST. LAURENT & WECHSLER LLP**
40 Wall Street, 53rd Floor
New York, NY 10005
(212) 397-3370

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

TABLE OF EXHIBITS ...................................................................................................iii

I.      Introduction ......................................................................................................1

II.     The Offense Conduct ........................................................................................3

        A.      Mr. Lawrence Recruited Employee-Investors For Downing and Mr. Wagner Using False Or Misleading Information ...........................................................7

        B.      Mr. Lawrence's Conduct Was Criminal But Materially Less Culpable Than Mr. Wagner's...................................................................................................11

III.    Mr. Lawrence's Extensive Efforts To Assist The Government In Its Investigation ........13

IV.     Mr. Lawrence's Personal History And Characteristics .....................................15

        A.   Mr. Lawrence's Professional History...........................................................16

        B.   Mr. Lawrence's Post-Arrest Contributions and Endeavors.........................17

        C.   Mr. Lawrence's Compelex Personal and Health-Related Adversity...........19

        D.   Mr. Lawrence Has Cultivated Close and Loving Personal Relationships.................21

V.      A Sentence of Probation is Lawful, Authorized and Sufficient to Satisfy the Section 3553(a) Factors.......................................................................................21

        A.      The Advisory Guidelines Do Not Set Forth An Appropriate Range for Sentencing In This Case. .........................................................................22

        B.      A Sentence of Probation Recognizes the Seriousness of the Offense, Provides Just Punishment and Will Satisfy the Purposes of General and Specific Deterrence...24

VI.     Conclusion ......................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Nelson v. United States*, 129 S. Ct. 890 (2009) ...........................................................................22

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ..................................................22

*U.S. v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ................................................................................22

*United States v. Gaind*, 819 F. Supp. 699 (S.D.N.Y. 1993) .........................................................25

*U.S. v. Gupta*, 904 F.Supp.2d 349 (S.D.N.Y. 2012) ..............................................................21, 23

*U.S. v. Johnson*, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ....................................................22

*United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010) .............................................23

*U.S. v. O'Connor*, 2002 WL 31260257 (S.D.N.Y. 2002) .............................................................24

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) ................................................................................24

**Statutes**

18 U.S.C. § 3553 .................................................................................................3, 21-24, 26-27

28 U.S.C. § 994 ............................................................................................................................24

U.S.S.G. § 2B1.1 ..........................................................................................................................22

# TABLE OF EXHIBITS

*JAMA Surg.*, "Computer-Assisted Process Modeling to Enhance
Intraoperative Safety in Cardiac Surgery" (Dec. 1, 2016)…………………………………..Exhibit A

Employment Agreement dated March 3, 2014……………………..…………………..Exhibit B

Compilation of Email Communications…………………………………………………..Exhibit C

Letter from Hal C. Lawrence, III, M.D……………………………………...…...………Exhibit D

Letter from Charisse Grant……………………………………………….…………Exhibit E

Letter from Christopher G. Nelson, M.D……………………………………………….Exhibit F

Letter from Ken Wyckoff……………………………...……………………………..Exhibit G

Letter from G. Donald Rosenkoetter…………………………………..……………..Exhibit H

Letter from Brent V. Edington…………………………………………………………Exhibit I

Letter from Pete D'Alessandro…………………………………………………………..Exhibit J

Letter from Mary Crownover………………………………………………..………Exhibit K

Letter from Michael Wynn………………………………………………………….Exhibit L

Letter from Steven H. Newman………………………………………...…………...Exhibit M

Letter from Scott Brooker……………………………………………….……..Exhibit N

Defendant Marc Lawrence respectfully submits this memorandum in advance of his sentencing hearing scheduled for June 9, 2021. For the reasons set forth below, Mr. Lawrence respectfully requests a sentence of probation with six months of home confinement, with permission to leave home for medical appointments, work, and religious services.

## I.   <u>Introduction</u>

Mr. Lawrence will appear before this Court for sentencing on June 9, 2021, having pleaded guilty to two counts of securities fraud and one count of wire fraud in connection with a scheme in which he participated at the behest of his co-defendant, David Wagner ("Mr. Wagner").[1] Mr. Lawrence deeply regrets the crimes he committed and the harm he caused to the victims. Mr. Lawrence accepts responsibility for his offenses, made extensive post-indictment efforts to assist the government in its investigation, and intends to spend the rest of his life making amends to the victims, and to society, for this serious aberration in his conduct.

Mr. Lawrence knowingly and willfully participated in these crimes; however, Mr. Lawrence should not be viewed through the same lens as Mr. Wagner as a matter of justice. Mr. Lawrence was Mr. Wagner's first victim: he came aboard as an employee-investor who made a substantial personal investment into Mr. Wagner's company in 2014. Only after he was hired by Mr. Wagner did Mr. Lawrence learn that the company was not what he had been promised. Mr. Lawrence knows that he should have done what other employee-investors did when they learned they had been deceived—he should have left Mr. Wagner and his companies behind. Instead, believing that the companies' products would ultimately be successful, Mr. Lawrence tried to salvage the financial and professional commitments he had made when he was hired by Downing

---

[1] Mr. Wagner was sentenced by this Court on Monday, January 11, 2021.

at the age of 61, so he buckled down to try to "make it work." In so doing, Mr. Lawrence moved from being a victim to a participant in Mr. Wagner's scheme.

Because Mr. Lawrence did not have access to bank accounts or financial information at any of Mr. Wagner's companies, it was years after he left the company before he learned the extent of Mr. Wagner's financial misconduct, including that Mr. Wagner was misappropriating employee-investor funds for personal use. Although Mr. Lawrence received a portion of the salary he was promised by Mr. Wagner, he (unlike Mr. Wagner) did not otherwise personally benefit from any part of the scheme. Like other employee-investors, Mr. Lawrence lost his entire investment and he did not receive his full salary, reimbursement of his expenses, or the health benefits that he had been promised when he agreed to go work for Mr. Wagner. And Mr. Lawrence did not direct the scheme or any co-conspirators; rather, his own participation was overseen and directed by Mr. Wagner who was his boss.

None of this is an excuse for Mr. Lawrence's own conduct. Mr. Lawrence understands that even though he and Mr. Wagner are not similarly situated, he helped Mr. Wagner further the scheme by knowingly misleading employee-investors, and in doing so he violated federal law and caused substantial harm to multiple victims. He feels deep remorse for his actions—and since his indictment, Mr. Lawrence has made substantial efforts to assist the government, to examine and improve himself personally, to find meaningful employment and contribute to his community, and to be a devoted and loving partner to his companion, who suffers from Multiple Sclerosis and Fibromyalgia. Mr. Lawrence is 67 years old, with health issues. There is essentially no chance of recidivism in this case.

For the reasons set forth herein, we respectfully submit that a sentence of probation, with six months of home confinement (with permission to leave home for medical appointments, work,

and religious services), would properly account for the factors set forth in 18 U.S.C. § 3553(a). A sentence within the guidelines range, on the other hand, would exceed what is required in the interest of justice. Probation is sufficient and not greater than necessary to punish Mr. Lawrence and serve justice in this case.

## II.     The Offense Conduct

In 2014, Mr. Lawrence was contacted by a recruiter about an opportunity to work for Mr. Wagner at Downing.[2] Mr. Lawrence had been looking for work after leaving his previous job the year before, and he was intrigued by the opportunity because it appeared to be squarely within his expertise and interest—developing and commercializing early stage technologies for the health care industry—and because he believed it was a chance to be involved in realizing the potential of an exciting, and possibly life-saving, product to which Downing had acquired development rights.

The product, known as the 3si HUB, uses the concept of speech recognition to detect missing words—and therefore missing crucial steps—in high risk cardiothoracic surgical procedures. In operating rooms worldwide, health care workers essentially follow "scripts" when performing surgical procedures. For instance, at a very basic level, a cardiothoracic surgeon performing heart surgery might direct someone to "remove clamp," and a nurse or surgical aide would remove the clamp and then state, "clamp removed," prompting a bypass pump to be turned off. When parts of the script are missed, mistakes can be made and patients can be harmed or even

---

[2] Between 2014 and 2017, Mr. Lawrence worked for Downing Digital Healthcare Group ("DDHG"), Downing Health Technologies, LLC ("DHT"), and other companies affiliated with Mr. Wagner. For ease of reference, and unless the name of a particular entity is relevant, Mr. Wagner's companies are referred to herein collectively as "Downing."

killed as a result.[3] The 3si HUB detects when components of surgical "scripts" are missing and immediately sets off an alert so the people in the operating room can backtrack or adjust as needed to avoid patient harm. The 3si HUB was at all relevant times—and still is—a legitimate product with genuine medical potential. *See* Exhibit A (*JAMA Surg.*, "Computer-Assisted Process Modeling to Enhance Intraoperative Safety in Cardiac Surgery" (Dec. 1, 2016)) (also available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5177530/ (last accessed May 18, 2021)); *see also* https://opusresearch.net/wordpress/2014/08/29/reflections-on-speechtek-natural-user-interfaces-go-far-beyond-speech-processing/ (last accessed May 18, 2021). George Robbie, one of the victims of the scheme (*see* PSIR p. 36), described the 3si HUB as a "potential home run" that would have made millions of dollars had it been brought to market. There was testing data and other information indicating the likely success of the 3si HUB, but Downing needed enough money to complete and commercialize the product. Had Mr. Wagner not drained the company of funds, this story may have had a very different ending.

Mr. Lawrence was already in his 60s when he was approached by Mr. Wagner's recruiter in 2014. Mr. Lawrence believed that the role at Downing would be his final job before retirement, and he felt his role in bringing the 3si HUB to market would be a way to make an important and positive mark in the medical device world before the end of his career. He also liked the idea of making an investment upon joining the company, as a way to "get in on the ground floor" and potentially earn a significant return on his investment as a result of his work.[4] Mr. Lawrence and

---

[3]   Medical errors are the third leading cause of death in the U.S. *See* https://www.hopkinsmedicine.org/news/media/releases/study_suggests_medical_errors_now_third_leading_cause_of_death_in_the_us (last accessed May 18, 2021).

[4]   Having worked for a number of large medical device companies previously, Mr. Lawrence learned that large companies tend to retain their profits from commercializing new products: the financial benefits are not typically passed on to employees on any significant scale. Accordingly,

Mr. Wagner closely negotiated the terms of Mr. Lawrence's initial employment by one of Mr. Wagner's companies, DDHG, reflecting Mr. Lawrence's reasonable belief that he was undertaking lawful employment, for which he would be paid salary and receive healthcare and other common benefits.

Mr. Lawrence's belief turned out to be unfounded: DDHG (and other companies affiliated with Mr. Wagner) would not provide lawful employment and Mr. Lawrence did not receive the salary and benefits he trusted Mr. Wagner (through DDHG and other entities) to provide. But trust he did: Mr. Lawrence signed an employment agreement on March 3, 2014 and became the Chief Development Officer of DDHG effective March 12, 2014. *See* Exhibit B. Mr. Lawrence was promised (among other things) an annual salary of $250,000 and health benefits coverage. *See id*. He also agreed to the required $250,000 investment and made an initial investment of $100,000.[5] *See id*.

Over the next few years, Mr. Lawrence would hold several high-level titles at Downing. After only three months, in June of 2014, Mr. Wagner promoted him to President of DDHG. Then in February of 2015, Mr. Lawrence became President and COO of DHT, where he remained until November of 2015, when Mr. Wagner made him President and COO of Downing M&A, LLC, a small, newly formed mergers and acquisitions group within the Downing companies. In July of 2016 Mr. Lawrence became the President and CEO of another newly created Downing entity, Cliniflow. That role lasted approximately four months, until Mr. Wagner demoted Mr. Lawrence

---

Mr. Lawrence liked the idea of a smaller model where each employee could ultimately be rewarded financially for contributing their personal funds and their efforts to early-stage technologies.

[5] Mr. Lawrence's investment consisted of $65,000 from his own personal funds; $35,000 borrowed from his brother, Hal; and $10,000 borrowed from his mother, Edna. In other words, when Mr. Lawrence first went to work for Downing, he had so much faith in Mr. Wagner and the company that he was comfortable asking his own family members to participate in the investment.

in November of 2016 for expressing concerns about the company's finances, including payroll issues. Mr. Lawrence then remained with Cliniflow, trying to earn his way back into Mr. Wagner's good graces, until the company folded in 2017.

Although Mr. Lawrence held executive titles at various Downing entities, they were titles only. He did not have any control over the investment funds or access to key bank accounts or financial statements for any of these entities.[6] Each of the Downing entities was majority-owned and controlled by Mr. Wagner; the financials of each company were ultimately controlled by Mr. Wagner; and Mr. Lawrence reported to and was directed by Mr. Wagner. *See* PSI ¶ 81.

Mr. Lawrence started his new job with the best of intentions. After several months, however, it became clear that Downing was having financial issues. First, external investments from family offices and equity firms evidently were not coming in as had been forecasted by Downing's Board of Directors. While Mr. Lawrence did not have access to bank accounts and would not have been privy to the discussions between Mr. Wagner (and others) who were responsible for such investments, Mr. Wagner and other Board members often included the details of such investments in formal presentations—characterizing them as firm, scheduled commitments rather than anticipated capital opportunities.

Second, DDHG began having difficulties making payroll and reimbursing employee expenses within several months after Mr. Lawrence was hired. Mr. Lawrence had difficulty understanding the shortfall in company funding, given what he was hearing about the abundance of outside funding, but he was told by Mr. Wagner that the shortfall was due to diverting funds to cover the substantial product development costs relating to the 3si HUB.

---

[6] Although Mr. Lawrence had his name on certain checking accounts during his time working for Downing, those accounts were never funded and Mr. Lawrence never had access to any accounts through which Downing funds moved.

Such problems, of course, were not unique to DDHG (or other Downing companies). Many start-up entities struggle with fundraising and with paying operating expenses, including payroll. In response, legitimate companies and business persons redouble fund-raising efforts, invest their own money, reduce headcount and expenses, and prioritize sales to increase cashflow; however, Mr. Wagner and Downing did none of those things. Rather, Mr. Wagner and other Downing employees doubled down on recruiting employee-investors, increasing headcount, and increasing payroll, in order to obtain those initial investments that they needed to operate—and, as Mr. Lawrence only learned much later, to fund Mr. Wagner's extravagant lifestyle.

This was the initial fork in the road where Mr. Lawrence had two choices: cut his losses and leave Downing, or stay at Downing and try to salvage his investment, his job, and what he knew was possible for the 3si HUB and for the company when he was hired. Mr. Lawrence made the wrong choice. He was fearful of losing his job at an advanced age, and he stayed. He believed that new investments to the company would salvage *everyone's* investments; not just his. He wanted to be liked and to be successful in his job and in the eyes of his boss and his co-workers. But ultimately, his attempts to salvage his hopes for Downing led to and crystallized into the serious felonies to which Mr. Lawrence has pleaded guilty in this case.

### A.   Mr. Lawrence Recruited Employee-Investors For Downing and Mr. Wagner Using False Or Misleading Information

Toward the end of 2014, Mr. Wagner put Mr. Lawrence in charge of recruiting new employee-investors for Downing. From then on, Mr. Wagner put in place investment benchmarks as performance standards, which Mr. Lawrence was required to meet—and Mr. Wagner would send abusive and hostile communications to Mr. Lawrence at times when Mr. Lawrence focused on issues at the company aside from bringing in new funds. *See, e.g.*, Exhibit C. Mr. Wagner prepared and gave Mr. Lawrence offering materials ("PPMs") to distribute to prospective

employee-investors, as well as supplemental information to pass along verbally to the prospective employee-investors.

Mr. Lawrence knew that critical information contained in the PPMs and given to him by Mr. Wagner was false or misleading, but he passed along that information to the prospective employee-investors as he was told to do. In addition, Mr. Lawrence repeated or explained that information in calls with some employee-investors. On multiple occasions, Mr. Lawrence attempted to address Downing's liquidity and payroll issues, and the contents of the PPMs, with members of Downing's Board of Directors. He was told that he knew nothing about investing and that he should not "worry" about any discrepancies between reality and the contents of the PPMs. In total, between late 2014 and 2017, Mr. Lawrence recruited twenty-two employee-investors to Downing, who invested a total of $4,550,000. Those twenty-two people are the victims listed on pages 20 and 21 of the PSIR, alongside the amount of loss for each victim.

While Mr. Lawrence did not receive all the salary promised, he was one of the people who received at least a portion of their salaries while they were employed by Downing, being paid $474,000 of the $1,170,000 he was owed by Downing for three years of work under his employment agreements. *See* PSIR p. 30. The initial $100,000 investment he made was lost entirely.[7] Mr. Lawrence realizes that even under these circumstances, he was one of the fortunate ones. Other employee-investors, including some who Mr. Lawrence persuaded to join and invest

---

[7] Mr. Lawrence also agreed to have $164,000 in salary and purported "bonuses" from Downing be converted into an additional investment, in order to reach the $250,000 investment threshold to which he agreed when he first joined Downing. Those funds, too, were ultimately lost.

in Downing, lost similarly substantial investments and were never paid a fraction of what they were owed in salary or benefits.[8]

Other than the payment of salaries, expenses and healthcare benefits, Mr. Lawrence does not have direct knowledge of where most of the invested money went. He did not have access to or control over the Downing accounts or financials, which were managed exclusively by Mr. Wagner. Mr. Lawrence has now learned that Mr. Wagner appropriated large sums of cash for personal expenses, including costly automobiles and college expenses for his children – but beyond that, and the portions of the salary he received, Mr. Lawrence does not know how Mr. Wagner ultimately used the money that was put into the company by the various victims of the scheme, or how it came to pass that so little of it remained to make restitution to victims.

Until very close to the end of Downing, Mr. Lawrence sincerely believed that the company had potential, and that it would be able to dig itself out of its financial hole and make the 3si HUB (and possibly other technologies) successful. He believed that he, along with the other employee-investors, would ultimately be made whole when the company emerged from the start-up phase and became financially successful. Even in the final months of Downing in late 2016, Mr. Lawrence was imploring Mr. Wagner to help sort out the company's financial circumstances in order to make payroll and fund the company's other obligations. Mr. Wagner responded by threatening Mr. Lawrence's position at the company, and reminding Mr. Lawrence that he was expected to recruit additional employee-investors to the company. *See* Exhibit C.

---

[8] For any given Downing entity at which he worked, Mr. Lawrence was only paid when other employees of that entity were paid. Accordingly, he would sometimes go for months at a time without receiving any portion of his salary. Other employees, who worked at other Downing entities and/or did not remain with Downing for as long as Mr. Lawrence, may have received no salary payment at all.

It is initially difficult to understand why Mr. Lawrence—who had an unblemished 35 year career in business—did not leave Downing at this point or earlier, or take other steps to stop Mr. Wagner, rather than become a participant in Mr. Wagner's scheme. But the reasons are simple: Mr. Lawrence believed in the 3si HUB, believed that the product and the company would ultimately succeed, and that the outcome would be a positive one for everyone involved. He was very scared of losing his job in his sixties and not being able to find another one, and was fearful of the impact that would have on his finances. He was being aggressively manipulated and fooled by Mr. Wagner, who required Mr. Lawrence to bring in a certain number of investments each year as a condition of his employment. Mr. Wagner hid from Mr. Lawrence Mr. Wagner's misuse of funds and how bad things at Downing really were – and Mr. Lawrence believed the money being invested was going to the company, not to fund Mr. Wagner's lifestyle. And, during this period, Mr. Lawrence was seriously distraught by troubles in his marriage, in which his wife suffered from severe psychological issues, including a personality disorder, depression, and kleptomania (leading to multiple arrests), which were causing their relationship to break down. None of these factors excuse Mr. Lawrence's conduct—but they are understandable on a fundamental human level.

Mr. Lawrence knows that, notwithstanding his intentions, his conduct was unlawful, wrong and hurt people. He has reviewed each victim impact statement filed with the Court, and has attempted to internalize the experiences conveyed by each person who submitted a statement. He is painfully aware that his conduct caused financial and emotional losses by people in situations much like his: people whose financial investments in Downing were personally significant, and who needed their savings, salaries, and benefits to support themselves and their families. Mr. Lawrence knows that he allowed himself to be used by Mr. Wagner, and thereby enabled Mr.

Wagner, by giving false and misleading information to the employee-investors he was tasked with recruiting. He understands that, in doing so, he caused severe harm to the victims and to their families. Mr. Lawrence understands that his conduct constitutes securities fraud and wire fraud, the offenses to which he has pleaded guilty. He is deeply remorseful and he is ashamed of his conduct.

> **B.      Mr. Lawrence's Conduct Was Criminal But Materially Less Culpable Than Mr. Wagner's**

On January 11, 2021, the Court sentenced Mr. Wagner to 72 months in prison. We respectfully submit that, although Mr. Lawrence and Mr. Wagner have pleaded guilty to the same crimes, they should not be placed on equal footing for purposes of justice.

Mr. Lawrence and Mr. Wagner are not similarly situated. Mr. Wagner ran his scheme for his own personal profit, while Mr. Lawrence did as he was directed in a seriously mistaken (and ultimately criminal) effort to succeed at his job. Mr. Wagner had sole control over the Downing accounts and over the scheme, directing his employees and withdrawing funds from the companies for his own personal use, while Mr. Lawrence had very little financial insight into Downing, and received only a fraction of the salary he was owed for 3 years of work. In short, Mr. Wagner and Mr. Lawrence were in no sense "partners" in this scheme; to the contrary, email communications show the power differential between Mr. Lawrence, who was attempting to satisfy his boss, and Mr. Wagner, whose practice was to criticize and manipulate Mr. Lawrence. *See, e.g.*, Exhibit C.

A number of these facts are reflected in the PSIR, in which the government recounts the details of the offense conduct:

- The "Downing entities were majority-owned and controlled by MR. WAGNER." PSIR ¶ 15.

- The DDHG and Cliniflow PPMs were "drafted, in part, reviewed, and approved by MR. WAGNER." *See id.* ¶¶ 35, 64.

- Although Mr. Lawrence frequently sent offer letters to employee-investors, "MR. WAGNER ultimately authorized the terms and conditions of the employee-investors." *Id*. ¶ 39.

- Mr. Wagner directed Mr. Lawrence not to disclose or discuss certain facts with current and/or prospective employee-investors. *See id*. ¶ 46.

- Mr. Wagner repeatedly transferred investor and other company funds to himself for personal use. *See id*. ¶¶ 48, 57, 59, 64, 78.

- Mr. Wagner had sole control and signatory authority over the Downing bank accounts. *See id*. ¶ 64.

Accordingly, in making a sentencing recommendation relating to Mr. Lawrence's case, Probation considers "that Lawrence did not profit similarly from the scheme as did Mr. Wagner, whom Lawrence was taking orders from. We also note that Lawrence did not direct any coconspirators and he had no control over Downing's bank accounts." PSIR p. 43.[9]

Moreover, in sentencing Mr. Wagner, the Court noted that Mr. Wagner had displayed callousness over and above his offense conduct, including by misappropriating funds for personal items such as luxury cars. There is no such callousness on Mr. Lawrence's part: he deeply regrets the actions he took and the part he played in causing suffering to so many victims—suffering to which he can relate because he, too, was a victim of Mr. Wagner.

Mr. Lawrence wishes to make amends and accept responsibility for his actions. A sentence of probation with home confinement would punish him and restrict his freedom, while also allowing him to continue working to afford at least a portion of the restitution owed to the victims in this case.

---

[9] Probation has recommended a sentence of 48 months' imprisonment with a three-year term of supervised release for Mr. Lawrence.

Finally, while Mr. Lawrence was among the first of Mr. Wagner's victims, he was also one of his last. During 2016 and 2017, Mr. Lawrence and Mr. Wagner negotiated and re-negotiated several agreements under which Mr. Wagner agreed to make up all or a portion of Mr. Lawrence's unpaid salary and benefits. However, Mr. Wagner never did as he was promised, leading Mr. Lawrence to file a lawsuit against Mr. Wagner in 2017 for lost wages, benefits, expenses, and investments totaling approximately $700,000. Mr. Wagner never paid the balance or resolved the lawsuit and now there appears to be no chance that he will. In addition, in a final betrayal, Mr. Wagner produced to Mr. Lawrence W-2 tax forms that (among other problems) falsely indicated that a Downing entity had withheld sums from Mr. Lawrence's salary and remitted them to the federal government for payroll and other taxes. As it turned out, the company had never done so, and by giving Mr. Lawrence the forms that Mr. Wagner knew Mr. Lawrence would rely upon, Mr. Wagner caused Mr. Lawrence additional damages in the form of back taxes, penalties, and interest on the unpaid amounts.

## III.   <u>Mr. Lawrence's Extensive Efforts To Assist The Government In Its Investigation</u>

Since his arrest on June 14, 2019, Mr. Lawrence has endeavored to provide substantial assistance to the FBI, the SEC, and the United States Attorney's Office ("USAO") in their investigations of the scheme Mr. Wagner was running at Downing. On the day of his arrest, Mr. Lawrence sat with the FBI and answered the agency's questions for over 90 minutes, providing information about key players within Downing, including "P-1," "P-2,"[10] and Mr. Wagner. Mr.

---

[10] "P-1" and "P-2" have not been charged in this case and are referred to herein using only their initials. "P-1" was, among other things, an officer and member of the Board of Directors of Downing Investment Partners, LP. "P-2" was, among other things, the CFO of Downing Investment Partners and CliniFlow Technologies, LLC. The Government is aware of the identities of these individuals.

Lawrence also described his own role at Downing—including his recruitment of employee-investors and the contents of the materials he had used in recruiting.

Thereafter, Mr. Lawrence met with investigators three additional times. On July 29, 2019, Mr. Lawrence came from Florida to meet all day with the government at the SEC's New York office. The focus of that meeting was Mr. Lawrence's tenure at Downing, including his own recruitment by Mr. Wagner, his responsibilities and roles through the years, and his knowledge regarding the financial state of the company.

The Government then requested another meeting with Mr. Lawrence, who again flew in from Florida to be interviewed on August 12, 2019. The in-person meeting was held at the USAO from 10:00 a.m. to 5:00 p.m. and the FBI and SEC also participated. During the interview, the Government focused on P-1's role at Downing. Mr. Lawrence answered questions about various e-mail exchanges, providing background about Downing's relationship with a recruiting company (and Downing's failure to pay their fees); whether the companies listed in Downing's recruitment materials actually fell under its portfolio; and various verbal communications that illustrated P-1's potential criminal culpability.

The third meeting, also requested by the Government, was held virtually on June 26, 2020, with the SEC, FBI, and USAO participating. Ahead of that meeting, on June 19, 2020, Mr. Lawrence completed a comprehensive review of his own files and produced 38 pages of documents that the Government did not appear to have, including contemporaneous notes from his handwritten journal.

To further aid the Government in its identification of potential additional defendants, Mr. Lawrence produced two memoranda on the potentially criminal acts of P-1 (the "P-1 Memorandum") and one other individual, "P-3." Those memoranda, together with corresponding

exhibits, provided concrete examples showing potential fraud by P-1 and P-3. The P-1 Memorandum also detailed instances wherein P-1 demonstrably lied under oath to cover up wrongdoing at Downing.

In sum, Mr. Lawrence has spent substantial time and resources to do his part to aid the Government in its prosecution of David Wagner and its potential indictment of additional defendants. From June of 2019 through the present, he has accepted responsibility for his own criminal conduct and endeavored to assist the government.

## IV.     Mr. Lawrence's Personal History And Characteristics

Mr. Lawrence was born 1954 in Rochester, Minnesota; the son of Halcut Clifford Lawrence, Jr. ("Clifford") and Edna S. Mickal ("Edna") and the younger brother of Halcut ("Hal"). A few years after Mr. Lawrence was born the family settled in Muncie, Indiana, where they lived throughout the remainder of Mr. Lawrence's childhood.

Mr. Lawrence was molded by his parents. Clifford was an optician with his own practice. Earlier in her life, at age 24, Edna took over managing her father's store, traveling extensively for her purchasing responsibilities, and eventually taking accounting classes so she could handle the accounting for the store. Although she stayed home for a number of years to raise her sons, Edna returned to work after Mr. Lawrence left school to attend college. Through their words and examples, Clifford and Edna taught Mr. Lawrence and his brother the importance of hard work, honesty, accountability, and keeping one's commitments.

In his personal life, Mr. Lawrence has been a loving and supportive friend, brother, and partner, and he continues to this day to be a source of comfort and support to those around him. Mr. Lawrence's brother, Hal, recounts many ways that Mr. Lawrence has shown generosity of spirit and a desire to help others; from helping neighbors with yard work or snow removal, to

providing a financially troubled friend with household furnishings, to continuing to support his ex-wife's family in both life and death. *See* Exhibit D. Hal recalls the unwavering devotion Mr. Lawrence showed to his brother and his parents through multiple challenges, and describes Mr. Lawrence as "a trusted and reliable brother, son and friend to many." *See id*.

> Charisse Grant, Mr. Lawrence's former sister-in-law, writes:
>
> Some of the most important things Marc taught me and insisted on was a high standard of ethics, integrity and honesty. He would always drive home the point that your word was everything in all aspects of life. I have always tried to live up to the high standards he taught me and that he set for himself . . .
> I know Marc is a good, honest person . . . I don't think that there are a lot of people today that would go out of their way to help or save someone else. But Marc Lawrence can hold his head high because he has helped and if you let him, he will continue to help others with his life.

Exhibit E.

Dr. Christopher Nelson, who has known Mr. Lawrence for nearly 50 years, recounts times when Mr. Lawrence has been there for Dr. Nelson and others, describing Mr. Lawrence as "always willing to help when I needed an extra set of hands." Exhibit F. He describes Mr. Lawrence as an "honest and honorable man" who has been a "force of good and compassion [ ] for others." *See id*.

### A.    Mr. Lawrence's Professional History

Until he went to work for Mr. Wagner, Mr. Lawrence's professional life wholly reflected the values he learned from Clifford and Edna. He got his first job directly out of college at American Hospital Supply, starting in a sales position and being promoted twice before moving on to Diasonics (a diagnostic imaging company) and then to Johnson & Johnson Ultrasound. Mr. Lawrence then made a short detour into the aquaculture and poultry industries before returning to the medical device industry in 1992, when he joined Royal Philips Electronics ("Philips") in the Netherlands. He remained with Philips until 2006, and thereafter went on to hold senior roles with several companies including Ultra-Electronics, Accelerated Business Initiatives (of which Mr.

Lawrence was the co-founder), and HeartSine Technologies. In short, in the 38 years between 1976, when Mr. Lawrence graduated from college, and 2014, when he was hired by Mr. Wagner, Mr. Lawrence had a long and upstanding career unblemished by any misconduct or ethical concerns, let alone criminal conduct. Ken Wyckoff, who worked with Mr. Lawrence from 2000 to 2006, describes Mr. Lawrence as "an intelligent, thoughtful, reliable and caring person who has had a positive impact on many people, including me." Exhibit G.

Between 2014 and 2017, Mr. Lawrence worked for Mr. Wagner.[11] After Mr. Wagner's companies folded in 2017, Mr. Lawrence went to work for KynderMed, LLC, where he remained until his arrest in 2019. Donald Rosenkoetter, who worked with Mr. Lawrence during his time at KynderMed, describes Mr. Lawrence as "an intelligent, competent, creative, diligent and effective professional" who "displayed excellent character and developed good relationships with those he interfaced with." *See* Exhibit H. Similarly, Brent Edington—the Director of the Office of Commercialization at Florida State University—came to know Mr. Lawrence, both personally and professionally, during Mr. Lawrence's time at KynderMed. *See* Exhibit I. Mr. Edington emphasizes the trust and respect he has for Mr. Lawrence, and states that he would like to work with Mr. Lawrence again after Mr. Lawrence's legal issues are behind him. *See id*.

B.      **Mr. Lawrence's Post-Arrest Contributions And Endeavors**

Following his arrest, Mr. Lawrence initially was able to find employment as a courtesy shuttle driver with Bert Smith Volkswagen, BMW, Porsche & Subaru in St. Petersburg, Florida, where he remained from February until June of 2020. *See* Exhibit J. Mr. Lawrence's supervisor, Pete D'Alessandro, states that Mr. Lawrence was punctual and reliable, and that he "would be eligible for rehire should the circumstances arise." *See id*.

---

[11] Mr. Lawrence's time working for Mr. Wagner is addressed in Section II, *supra*.

Since July of 2020, Mr. Lawrence has been employed as a practice administrative consultant for Miss Mary, a behavioral health provider based in Orlando, Florida. Miss Mary consists of a team of licensed school psychologists who work with children, adolescents, and families to evaluate children for educational challenges, and help prepare clients for resiliency in future life events. *See* Exhibit K. Mr. Lawrence has been proud to support the Miss Mary team as they improve the lives of children and families in Orlando and surrounding areas. Mary Crownover, who is the founder of Miss Mary and also Mr. Lawrence's partner, describes the contributions Mr. Lawrence has made to the Miss Mary practice:

> His business experience, marketing and financial insight, as well as incredible organizational skills are a blessing to my small business . . . with Marc's help my one-woman practice in Orlando has grown to a team of 5 psychologists! He has been a huge asset since joining Miss Mary in a part-time role and I hope he can continue to participate and assume a full-time position in the near future.

*See id*.

Wanting to supplement the income he receives from his work for Miss Mary, Mr. Lawrence also obtained a seasonal position this spring with Kitchfix, a company that provides food support to the Toronto Blue Jays during the team's spring training near Mr. Lawrence's home. His employer describes Mr. Lawrence as "always prompt, professional and a pleasure to have around," noting also that Mr. Lawrence "will certainly be missed and I would personally support and endorse any future endeavors that he might pursue." Exhibit N. Mr. Lawrence intends to work for Kitchfix again next spring if he has the opportunity to do so.

In addition to his gainful employment, Mr. Lawrence also has sought to contribute his time and his professional experience by volunteering with Pacific Community Ventures ("PCV"). Through PCV, Mr. Lawrence is part of a support group assisting small business owners with

fundamental operational and strategic questions.[12] While Mr. Lawrence has drawn on his positive career experience in offering his thoughts and advice, he also has had the opportunity to share certain issues related to his experience at Downing, as a cautionary tale. He does not want to see anyone repeat his own mistakes.

Finally, Mr. Lawrence has sought to understand and repair the personal characteristics that sent him down an errant path at Mr. Wagner's behest. He has been attending regular meetings with Co-Dependents Anonymous, an organization that seeks to provide change and support to individuals who suffer from co-dependent characteristics. Such characteristics can include, but are not limited to, (i) struggling to set healthy priorities and boundaries, (ii) being extremely loyal and remaining in harmful situations for too long, and (iii) compromising one's own values and integrity to avoid rejection or anger. *See* https://coda.org/meeting-materials/patterns-and-characteristics-2011/ (last visited May 18, 2021). Mr. Lawrence believes that these characteristics drove his involvement and acquiescence in Mr. Wagner's scheme, and he has been doing the personal work necessary to ensure that he does not repeat his prior mistakes.

### C.    Mr. Lawrence's Complex Personal And Health-Related Adversity

Mr. Lawrence's life has not been without challenges. He has had serious health scares, including a five-day stay in a cardiac intensive care unit in 2006 for ventricular tachycardia, as well as a progressive loss of vision in 2008, which led to emergency surgery lasting 9.5 hours to remove a noncancerous tumor encasing the optic chiasm and directly above the pituitary gland in his brain. *See* PSIR pp. 27-28. The surgery and subsequent 6 weeks of radiation therapy led to Mr.

---

[12] Mr. Lawrence has no stake or interest in any of the small businesses he has helped advise through his volunteer work with PCV. He is not assisting any company involved in equity sales or fundraising, and he would not have accepted the volunteer position if that was the nature of the businesses seeking assistance through PCV.

Lawrence losing pituitary function, and he is now required to take a complicated regimen of medications (including injections) to ensure that his thyroid gland continues to function. He also must have an annual MRI test performed to ensure that the tumor has not returned.

In his personal life, Mr. Lawrence has wished to find a loving and reliable life partner and to establish a secure home life for himself, but instead has endured the ends of several difficult marriages—including one that was falling apart during the period in which Mr. Lawrence was working for Mr. Wagner. *See* PSI pp. 25-26. In 2018, Mr. Lawrence was forced to file for bankruptcy, after the years working for Mr. Wagner finally took an unsustainable toll on his finances. Michael Wynn, an attorney, describes how he came to know Mr. Lawrence when Mr. Lawrence needed legal help "after having been financially devastated by his involvement with Mr. David Wagner." *See* Exhibit L. Mr. Wynn describes Mr. Lawrence as "a man of character, remorse, and faith," and writes that even in a time of personal devastation, Mr. Lawrence showed "a level of perseverance and character that few possess." *See id*. Mr. Wynn clarifies that although he is a lawyer, "I am writing this to not advocate for a client, but I am writing to advocate for a man that has truly become a friend." *See id*.

Mr. Wynn is not the only professional who witnessed Mr. Lawrence's reaction to the challenges created as a result of working for Mr. Wagner's companies. Steve Newman, a CPA, has been Mr. Lawrence's accountant since 2003. Mr. Newman recounts the difficulty Mr. Lawrence faced in 2016, when he was unable to obtain a reliable W-2 from Mr. Wagner in order to file his tax returns. Mr. Newman writes that "[a]t every frustrating step, Marc wanted to do what was correct and not shortcut the process. I give Marc a lot of credit for his determination to file a complete and accurate 2016 tax return throughout his inability to obtain a customary W-2 form . . . . Marc exhibited good ethical and moral character during this process." *See* Exhibit M.

### D.     Mr. Lawrence Has Cultivated Close And Loving Personal Relationships

Mr. Lawrence's letters of reference reflect that he is valued by his friends and family members, and is an important caregiver to his companion who has Multiple Sclerosis. *See* Exhibits D-N. He is a source of love and support to those around him—including, significantly, to his current partner Mary Crownover. Ms. Crownover and Mr. Lawrence met in May of 2019 and they now share a life together in Clearwater, Florida. Ms. Crownover has chosen to share with the Court some details about the depth of the connection she and Mr. Lawrence has found with one another:

> I love Marc now more than I did the summer of 2019. He is the partner I have never had, and I need him. On a personal level, Marc is my lover, friend and caregiver when needed. Diagnosed with both Multiple Sclerosis and Fibromyalgia, there are days I am less than functional and cannot complete daily living tasks alone. Marc is caring, thoughtful and attentive to me every day.

Exhibit K. She states that her family is aware of Mr. Lawrence's conviction in this case, and that they collectively "have chosen to love and accept him into our lives; and feel we are the better for it." *Id*. She concludes her letter with a plea: "I would like to have him home with me. I love and need him dearly . . ."

In his 67 years, Mr. Lawrence has not been a perfect person, but he has tried to live up to the values his parents instilled in him: to work hard, to be honest, to keep his commitments, and to be accountable for his actions. On June 9, 2021, he will appear before the Court to be held accountable for the most serious mistake of his life: the time he spent working for companies owned and run by his co-defendant, Mr. Wagner.

## V.     <u>A Sentence of Probation is Lawful, Authorized and Sufficient to Satisfy the Section 3553(a) Factors</u>

In undertaking the solemn duty of sentencing a criminal defendant, the Court is required "to consider, with great care and sensitivity, a large complex of facts and factors." *See U.S. v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012) (Rakoff, J.). The relevant "complex of facts and

factors" is different for each defendant: "[w]hereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results." *See id*.

### A.    The Advisory Guidelines Do Not Set Forth An Appropriate Range for Sentencing In This Case

It is through careful and individualized consideration that courts uphold the mandate of 18 U.S.C. § 3553(a), which requires the imposition of "a sentence sufficient, **but not greater than necessary**," to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). The Guidelines range is only one of the various factors in 18 U.S.C. § 3553(a) for the Court to consider in issuing a sentence. *See* 18 U.S.C. § 3553(a). As the Supreme Court has said, "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (emphasis in original).

In particular, courts in this Circuit have long taken issue with the effect of the loss-enhancement factor on calculating a defendant's sentence for fraud under the Guidelines. *See, e.g.*, *U.S. v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013) (noting that an application note to U.S.S.G. § 2B1.1 "indicates that a downward departure may be warranted where the offense level resulting from a loss calculation overstates the seriousness of an offense."); *id.* at 378-80 (concurrence by Underhill, D.J.) (noting "the problems with the loss guideline"; observing that the loss guideline "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices."); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss . . ."); *U.S. v. Johnson*, 2018 WL 1997975, *3 (E.D.N.Y. Apr. 27, 2018) (noting that "the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any

approximation of the moral seriousness of the crime."); *United States v. Ovid*, slip op., 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) (observing that "the fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so.").

In this case, "because the offenses involved a total loss of more than $3,500,000 but less than $9,500,000, the offense level is increased by 18 levels." PSI p. 4. With all elements factored in, Mr. Lawrence's applicable Guidelines offense level is 28. PSI p. 5. In other words, without the steep adjustment for the total loss, the applicable Guideline offense level for Mr. Lawrence would be 10 rather than 28. Therefore, almost two-thirds of the total points in Mr. Lawrence's Guideline level are attributable to the financial gain of Mr. Wagner and his companies. For someone like Mr. Lawrence, who has a Criminal History Category of I, an offense level of 10 correlates to a Guideline sentence of 6 to 12 months—whereas an offense level of 28 correlates to a Guideline sentence of 78 to 97 months.

This type of steep increase based on the loss amount has been deemed irrational in a case analogous to this one, where the defendant did not intend the amount of the loss or personally profit in the amount of the loss. *See, e.g.*, *Gupta*, 904 F. Supp. 2d at 351 (reasoning that "there is no better illustration of the irrationality of [the loss Guidelines factor] than the instant case[,]" where most of defendant's points under the Guidelines were "exclusively the product" of monetary gain of his co-defendant and his companies, in which the defendant "did not share in any direct sense"). Sentencing Mr. Lawrence according to the Guidelines would place undue weight on that single Guidelines factor—the amount of the loss—and would result in a sentence that is greater than necessary to satisfy the objectives set forth in 18 U.S.C. § 3553(a).

**B.   A Sentence of Probation Recognizes the Seriousness of the Offense, Provides Just Punishment and Will Satisfy the Purposes of General and Specific Deterrence**

The purposes of sentencing in 18 U.S.C. § 3553(a) would be achieved by sentencing Mr. Lawrence to probation with home confinement—a sentence that would restrict Mr. Lawrence's freedom for years to come. *See U.S. v. O'Connor*, 2002 WL 31260257 (S.D.N.Y. 2002) (issuing sentence of four years of probation with special conditions to defendant convicted of securities and wire fraud).

It is the type of sentence that Congress contemplated in passing the Sentencing Reform Act of 1984, in which Congress distinguished between career and violent offenders warranting incarceratory sentences, on the one hand, and non-violent first-time offenders warranting probation sentences, on the other hand. *See* 28 U.S.C. § 994(j) (instructing the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . .").

It is also a sentence that would reflect Mr. Lawrence's lack of motive. *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) (observing that a defendant's motive for committing an offense is an important factor in sentencing). As discussed above in detail, Mr. Lawrence aided Mr. Wagner and he harmed others, but he did not set out on this journey to harm anyone: his only motives were to get and keep a job, to make an investment, to make the company successful, and to bring to market a useful product he believed in.

Mr. Lawrence lives with the consequences of his conduct every day. His conviction is public knowledge, and he has been embarrassed and ashamed in his personal and professional circles. His professional life has been irreparably damaged: he is 67 years old and it will be very difficult now for him to return on a full time basis to the field of work—consulting and health

24

care—to which he devoted his career. He was forced to declare bankruptcy in 2018 after his time at Downing resulted in financial devastation for him, and his life savings have been almost entirely wiped out. *See, e.g.*, *United States v. Gaind*, 819 F. Supp. 699, 671 (S.D.N.Y. 1993) (granting downward departure where defendant already had been punished by the loss of his business).

Before Downing, Mr. Lawrence had never committed a crime and he will never commit another crime again. Until he crossed paths with Mr. Wagner, Mr. Lawrence lived an upstanding life according to his values. Mr. Lawrence has learned the hard way what can happen when a person allows themselves to be directed by someone with corrupt motives. He knows that he was wrong to hope that circumstances at Downing would change, and he should have adhered to his personal values rather than following Mr. Wagner's directives. And most importantly, Mr. Lawrence recognizes the harm caused to others as a result of his conduct and he is deeply sorry. He has sought all his life to be a source of aid and comfort—not harm—to other people. He will not make the same mistakes again, and a sentence beyond probation is not necessary to achieve specific deterrence.

A sentence of incarceration is also unnecessary to achieve general deterrence. Research in the last decade has shown that there is no clear correlation between the severity of punishments and general deterrence. *See* Daniel S. Nagin, "Deterrence In The Twenty-First Century," 42 Crime & Just. 199, 201 (2013) (describing research on deterrence and concluding, *inter alia*, "that there is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation"); Katelyn Carr, "An Argument Against Using General Deterrence As A Factor In Criminal Sentencing," 44 Cumb. L. Rev. 249, 263 (2013-2014) (citing a study "finding no evidence that shows a causal connection

between variations in sentence severity and . . . between the severity of sentences in general and levels of crime.").

Further, under 18 U.S.C. § 3553(a)(2)(D any sentence imposed upon Mr. Lawrence must ensure that "needed . . . medical care" is provided "in the most effective manner". Incarceration would be a health risk for Mr. Lawrence given his medical conditions and history. Mr. Lawrence has had serious adverse health events (*see supra* pp. 19-20) and as a result, he must take a complicated daily regimen of medications and he needs frequent access to specialized clinical tests and physicians, including an endocrinologist and cardiologist.

Mr. Lawrence also has been a caregiver for his partner, Mary Crownover, who suffers from both multiple sclerosis and fibromyalgia. Ms. Crownover writes that "there are days I am less than functional and cannot complete daily living tasks alone. Marc is caring, thoughtful and attentive to me every day." Exhibit K. She continues, "I would like to have him home with me. I love and need him dearly and *Miss Mary* is stronger from his participation." *Id*.

Finally, incarcerating Mr. Lawrence would end his employment with Miss Mary, his volunteer work with PCV, and the personal work he is doing through Co-Dependents Anonymous. Miss Crownover would lose her loving partner and her source of daily support as she deals with the physical and emotional challenges of Multiple Sclerosis and Fibromyalgia, and their separation would take a toll on the connection they have found with one another at this stage of their lives. He may lose his home altogether. Mr. Lawrence has gone to great lengths to piece these aspects of his life together. All of these things would be disrupted, if not impossible to recreate, after any lengthy period of incarceration.

**VI.**    <u>**Conclusion**</u>

For the foregoing reasons, defense counsel respectfully submits that in Mr. Lawrence's case, a sentence of probation with six months of home confinement (with permission to leave home for medical appointments, work, and religious services) would be "sufficient, but not greater than necessary" to comply with the purposes of sentencing under 18 U.S.C. § 3553(a).

Dated:  May 21, 2021                    Respectfully submitted,

                                        HARRIS ST. LAURENT & WECHSLER LLP

                                        By: <u>/s/ Andrew St. Laurent</u>
                                            Andrew St. Laurent
                                            Jonathan A. Harris
                                            Alisha L. McCarthy
                                            Michelle Fox
                                            40 Wall Street, 53rd Floor
                                            New York, New York 10005
                                            (212) 397-3370
                                            andrew@hs-law.com
                                            amccarthy@hs-law.com

                                        *Attorneys for Defendant Marc Lawrence*